UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERNEST F. BEAL,

        Plaintiff,

     v.

CHICAGO TRANSIT AUTHORITY,

        Defendant.

No. 23 CV 1387

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Ernest Beal worked as a Rails Control Inspector for the Chicago Transit Authority. The CTA fired him for being absent without leave, but Beal claims that his supervisor forced him to go home after he presented medical work restrictions stemming from a workplace injury. He brought this lawsuit against the CTA for failure to accommodate, disparate treatment, and retaliation under the Americans with Disabilities Act; interference and retaliation under the Family and Medical Leave Act; and retaliatory discharge under the Illinois Workers' Compensation Act. The CTA reinstated Beal to his former position after the lawsuit was filed. The CTA now moves for summary judgment on all claims. Beal moves for partial summary judgment on his failure-to-accommodate claim and the CTA's affirmative defense for failure to mitigate damages. For the reasons discussed below, the cross-motions for summary judgment on the failure-to-accommodate claim are denied, Beal's partial motion for summary judgment on the affirmative defense is denied, and the CTA's motion for summary judgment on the remaining claims is granted.

## I.    Legal Standard

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). These standards apply equally to cross-motions for summary judgment, *Pryor v. Corrigan*, 124 F.4th 475, 486 (7th Cir. 2024), and I consider evidence from both motions to ensure that there is no material dispute, *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.    Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The moving party must file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(2). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. N.D. Ill. Local R. 56.1(b)(2)–(3).

Both statements of facts and additional material facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2). The monmoving party must cite specific, admissible evidence to dispute an asserted fact and concisely explain how the cited material controverts the asserted fact. N.D. Ill. Local R. 56.1(e)(3).

Beal responds to several of the CTA's facts without a concise explanation for the basis of the objection, simply denying the asserted fact and citing dozens of pages in the record or entire exhibits. *See* [88] ¶¶ 21, 40, 55, 63–64.[1] That's a rule violation, and the following facts are deemed admitted. *See* [88] ¶¶ 55, 63–64.

The CTA also fails to properly controvert asserted facts. For example, Beal asserts facts about his workers' compensation claim and communications with CTA personnel and third-party administrators, but the CTA responds about Beal's failure to update his address in the CTA's online system. *See* [95] ¶¶ 6, 11, 32, 35–36. These responses violate the rule because they do not properly controvert Beal's facts. Despite rule violations from both parties, I exercise my discretion to consider those facts that are properly supported by the record.

Legal arguments in the statement of facts are disregarded. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see* [84] ¶¶ 1–2, 4–6, 25, 32–33; [88] ¶ 67; [95] ¶ 20. General objections to the characterization of facts are also sustained, and I omit characterizations and rely on the language of the admissible evidence when possible. *See, e.g.*, [84] ¶¶ 14–15, 23; [88] ¶¶ 13, 18, 40, 44, 51; [93] ¶ 4; [95] ¶¶ 13, 41.

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page numbers. The facts are largely taken from the parties' responses to Local Rule 56.1 statements of material fact and additional fact where both the asserted fact and response are set forth in one document. [84]; [88]; [93]; [95]. The parties dispute many facts, but many of the facts in those disputes are not material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include them in the light most favorable to non-moving party.

Beal asserts facts related to his FMLA claims in support of his partial motion for summary judgment. *See* [84] ¶¶ 10, 14–16, 18, 20–23, 28. The CTA objects that evidence related to Beal's FMLA claims is immaterial to resolving his partial motion for summary judgment on the ADA claim. *See* [94] at 2–3. Those objections are overruled. Evidence of Beal's medical conditions, leave, and injury overlap across both claims, and on cross-motions for summary judgment, I may consider evidence submitted in support of one motion when deciding the other. *See Torry*, 932 F.3d at 584. For the same reason, I decline to disregard portions of Beal's response brief that incorporate facts from his cross motion by reference. *See* [87] at 9.

The CTA points out that Beal flouts the local rules by exceeding the page limits and including two-and-a-half pages of single-spaced and bullet-point paragraphs presenting evidence and argument on pretext. *See* [87] at 12–14. That's a rule violation, s*ee* N.D. Ill. Local R. 5.2(e), and I warned Beal's attorney that untimely and excessive filings may be disregarded. *See* [91]. The rules may seem like mere technicalities, but excessive and oversized filings are unfair to the opposing party tasked with responding within the proper limits. Beal's attorney did his client no favors by failing to comply with the rules, and indeed, he risked the brief being struck in its entirety. *See* N.D. Ill. Local R. 5.2(g) (a court may strike noncompliant documents). I exercise discretion to disregard the following pages of Beal's response brief. *See* [87] at 12–14.

The CTA objects to "self-serving" statements in Beal's declaration and testimony. *See* [84] ¶ 17; [89-1]; [95] ¶¶ 8–9, 28. For example, Beal testified to

conversations with his supervisors after he fell at work. *See* [95] ¶ 8. "[S]elf-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment." *Mitchell v. Exxon Mobil Corp.*, No. 24-2823, 2025 WL 1924526, at *4 (7th Cir. July 14, 2025) (quoting *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004)). Beal's statements are within his personal knowledge and there is factual support in the record to suggest these conversations occurred, even if the CTA may present conflicting testimony about the details of those conversations. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (self-serving statements in affidavits are admissible if they are based on personal knowledge and set forth specific facts showing that there is a genuine issue for trial).

Nor does the sham-affidavit rule bar Beal's declaration. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571–72 (7th Cir. 2015) ("[B]ecause summary judgment is not a tool for deciding questions of credibility… an affidavit can be excluded as a sham only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'"). The CTA points out inconsistencies between Beal's deposition testimony and declaration. [94] at 3–5. For example, Beal testified that he "merely" presented his supervisor with a doctor's note, but his declaration adds that he told his supervisor that he had already contacted the CTA's third-party administrator about short-term disability leave. [95] ¶ 17. These two assertions do not flatly contradict each other. "Few honest witnesses testify at any length without at least occasional lapses of memory or needs for correction or clarification." *Castro*, 786 F.3d at 571. I decline to strike Beal's declaration.

5

The CTA also objects to Beal's testimony as to statements made by his supervisors during conversations about his injury and leave. *See* [95] ¶¶ 8, 15, 18. Beal's supervisors made those statements while acting in the scope of their employment, so the statements are admissible as party-opponent admissions. *See* Fed. R. Evid. 801(2)(D) (statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay); *Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017).

## III. Facts

### A. Beal's Employment History

Beal started working for the Chicago Transit Authority in 2004, first as Car Repairer and later as Rails Control Inspector at the maintenance shop in Des Plaines, Illinois. [88] ¶ 2. The duties of a control inspector include inspecting "the components accessed through the Control System of CTA Rail vehicles"; inspecting, repairing, or replacing components of the charging system, propulsion controller, and other control components; performing "related duties as assigned"; and performing other jobs or tasks "as directed by the maintenance manager or designee, when necessary." [88] ¶ 5; [93] ¶ 1.

To access components of rail car systems, a control inspector must remove "covers" on a control group. [88] ¶ 6. There are two covers per group and eight control covers per rail car. [93] ¶¶ 2–3. Each cover measures six feet long and weighs at least 15 or 20 pounds. [88] ¶ 6; [93] ¶ 2. Control inspectors must also work in the "pit": the space underneath an elevated rail car that workers access for inspections and repairs. [88] ¶ 6. The parties dispute a third physical requirement. The CTA asserts that

6

control inspectors must use their arms to lift their body weight when exiting the pit, and in some instances, when boarding or deboarding a train. [88] ¶ 7. Beal attests that he was never required to board or deboard a train and that he was able to enter and exit the pit using stairs. *See* [88] ¶ 7; [89-1] ¶ 4.

While working for the CTA, Beal was diagnosed with Sjögren's Syndrome, lymphoma from Sjögren complications, lupus, and Raynaud's Syndrome. [84] ¶ 14. He was approved for short-term disability pay and continuous and intermittent FMLA leave to receive treatment related to these conditions at various times during his employment. [84] ¶¶ 14–15.

### B.    CTA Administrative Policies

The CTA contracts with third parties to administer benefits and leave for short-term disability, FMLA leave, and injuries on duty. [79-13] at 1. ReedGroup handles short-term disability and FMLA leave. [84] ¶ 20. CorVel handles workers' compensation and injury-on-duty claims. [84] ¶ 23.

#### 1.    *Short-Term Disability Policy*

The CTA's "Non-Work Related Injury or Illness For Bargained Employees (Short Term Disability)" policy provides medical leave with pay for employees with a non-work related injury or illness. [79-14] (Administrative Procedure No. 1010).

#### 2.    *Transitional Return to Work Program*

The "Injury on Duty (IOD) and Transitional Return to Work (TRTW)" policy applies to employees injured on duty. [84] ¶ 32 (Administrative Procedure No. 1012). An injury on duty refers to "[a]n injury, disease, illness, or medical condition sustained by an employee that arises out of and in the course of CTA employment."

7

[79-13] at 1. The program "returns injured employees to work at less than their full-duty assignment for a limited period after they have suffered an injury on duty with the objective to return the employee to full duty as soon as possible." [79-1] at 1. Section 4.6 governs eligibility. [79-13] at 3. Among other requirements, an employee must report an injury on duty that has been approved by the third-party administrator and provide their supervisor with a written Physical Capacity Evaluation. [79-13] at 3 (listing other criteria). Section 4.7 governs placement. [79-13] at 3–4. An employee's department determines transitional work assignments. Assignments may include the modification of an employee's regular job duties such as "the partial elimination of work activities essential to the performance of the job." [79-13] at 3.

### 3. *Family and Medical Leave of Absence Policy*

The CTA's FMLA policy covers both injury-on-duty time and short-term disability. [72-15] at 15 (Administrative Procedure No. 1013). An employee with eligible FMLA leave "who is injured on duty will have such absence designated as FMLA and counted toward the 12-week entitlement. Said eligible FMLA leave will run concurrently with the [injury on duty] absence." [95] ¶ 44; [72-15] at 15. An employee may also qualify for short-term disability claim status for a serious medical condition. [72-15] at 15. The policy states that: "In any circumstance in which the CTA does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying. Once the employer has

8

acquired knowledge that the leave is being taken for a FMLA-qualifying reason, the employer must notify the employee." [72-15] at 15.

When ReedGroup receives a reported absence from an employee, it forwards information about those absences to the administration managers at the employee's work location. [88] ¶ 58.

### 4. *Reasonable Accommodations Policy*

The CTA's policy for "Reasonable Accommodations in the Workplace for Employees with Substantial Medical Restrictions and/or Disabilities" governs accommodations. [84] ¶ 33; [79-15] (Administrative Procedure No. 1017). The Accommodation Review Committee is "[a] standing committee comprised of a representative from each of Human Resources, ADA compliance, and a manager from the employee applicant's work area" that considers and oversees accommodation requests from employees with medical restrictions or disabilities. [79-15] at 1. Section 4.2 outlines a manager's responsibility. [79-15] at 3. When a manager receives an accommodation request or "becomes aware of an employee's possible need for an accommodation, the manager should direct the employee to the ARC and notify the ARC of the employee's request or need via email." [79-15] at 3.

### C. Fall into the Pit and Shoulder Injury

On January 15, 2021, Beal missed a step while walking between rail cars and fell into the pit from a height of about five feet. [88] ¶ 27. Beal told his then-manager Charles Walker that he "fell into the pit." [88] ¶ 28. Beal finished his workday and did not complain about injury or pain. [88] ¶ 28. Three days later, on his next scheduled workday, Beal called the midnight manager to report, "I wasn't coming in

9

to work because when I fell in the pit on the 15th I think I hurt myself and I was going to the doctor." [88] ¶ 29. The next day, he reported to Manager Walker and then-Senior Manager Jeff Bell that he was hurt after falling into the pit on January 15. [88] ¶ 30.

Beal's doctor prescribed him ibuprofen and rest for shoulder pain, Beal took two weeks of sick leave, and then he returned to work without any medical work restrictions by February 1. [84] ¶¶ 17, 19; [88] ¶¶ 30–31. Some point after returning to work, Beal began experiencing "weakness" in his right arm. [79-1] at 182:3–8. He mentioned the weakness in his right arm to a co-worker, but he did not communicate any lingering issues to his supervisors. [88] ¶ 32; [79-1] at 182:19–23.

### D.    Leave Requests

Beal applied for continuous FMLA leave and short-term disability for the two weeks of missed work. [84] ¶ 18. In March, ReedGroup denied his application for short-term disability benefits because the injury occurred at work. [84] ¶ 20; [79-7] (appeal denial letter dated March 23, 2021, with a mailing address to 1510 Marengo Avenue). Four months later, Beal applied for intermittent FMLA leave related to his fall and for medical conditions related to his Sjögren's Syndrome. [84] ¶ 21. On October 8, ReedGroup approved Beal's request for intermittent FMLA leave from July 14, 2021, to January 1, 2022. [84] ¶ 21; [79-3]. Beal had 372.5 hours or 8.76 weeks of FMLA leave remaining as of October 8, 2021. [79-3] at 1.

On September 8, Beal filed a claim with the Illinois Workers' Compensation Commission. [88] ¶ 34; [72-18] at 2 (application form listing Beal's address at 1510 Marengo Avenue). On October 1, the CTA's third-party workers' compensation

administrator CorVel emailed CTA employees an "Employer's First Report of Injury" form with information about the January 15 incident and Beal's claim information. [95] ¶ 10; [89-17] at 4 (email recipients including John Taylor of CTA legal and Georgette Hampton of CTA Human Resources) & 5 (listing Beal's mailing address at 1510 Marengo Avenue).

On October 4, CorVel acknowledged receipt of Beal's workers' compensation claim and notified him at his 1510 Marengo Avenue address, [72-20] at 2 (emphasis in original):

> If your claim is found to be compensable, we will pay for medically necessary and reasonable treatment in relation to your injury, as well as lost time benefits to which you may be entitled. You will also receive an automatic FMLA approval, so long as you are an eligible employee for FMLA and have not exhausted the leave amounts that are allowed under the applicable state and federal laws. **Please note that the hours taken for your Injury on Duty will be designated as FMLA time**.

> In the event your Injury on Duty claim is denied; your work absence will be reviewed separately for Federal Medical Leave Act (FMLA) by a TPA FMLA Specialist at The Reed Group. The Reed Group administers all FMLA claims on behalf of the Chicago Transit Authority.

The CTA also issued a "Notice of Workers' Compensation Claim" to Beal's managers listing immediate actions: confirming relevant accident information with the claims examiner, forwarding injury on duty paperwork and documentation to the examiner, and contacting the examiner "on the first day your employee returns to work."[2] [72-19] at 7. CTA payroll also sent Kanitha Perry (Senior Manager of Rail Maintenance

---

[2] The CTA points out that the October 4th notice was directed to "Manager or Desginee" and asserts there's no evidence in the record to suggest Beal's supervisors actually received notice. [95] ¶ 14. The dispute is immaterial because the record reflects that Perry called Beal into the office to discuss his injury-on-duty claim the same day. [95] ¶ 15.

for the Blue Line and Beal's supervisor) a "Seven-Day Sick Pay Claim" form related to Beal's missed days in January; it referenced Beal's worker's compensation claim. [95] ¶ 13; [89-20]. Perry filled out the form. [89-20] at 1. This was the first time Perry learned that Beal had filed an injury-on-duty claim for his fall. [95] ¶ 13.

### E.    First Meeting with Supervisor Perry

The same day, Perry called Beal into the manager's office to ask him about the injury-on-duty claim. [95] ¶ 15. The parties dispute the details of the conversation. Beal testified that Perry asked him about the injury-on-duty claim; he told her that he fell in January but was "just now finding out that [he] need[ed] surgery"; Beal told Perry that he notified Manager Walker, who was standing nearby, but when Perry asked Walker, Walker denied knowledge of the incident. *See* [79-1] at 83:11–85:4.

Perry testified that nobody else was present at the meeting and that Beal mentioned an injury unrelated to his shoulder. [79-10] at 86:12–87:8. Beal told her, [79-10] at 87:24–88:8:

> [He] was walking across one of the tracks that has a grated walk path going across the pit, and he said that he lost his footing and his leg went dangling down the pit and he hurt his groin area. And he said that he went home that weekend… he was in more pain than he anticipated and he was out sick, but he was – he didn't say he was out sick, he said he was just off work at the time. And he did call in a claim with the ReedGroup, and he reported a sick entry.

Perry asked Beal about the late report, [79-10] at 88:21–24:

> If he was injured at work, why didn't you report it? And that's when he said that he didn't think it was that big of a deal, but any time you're injured or hurt or whatever happened, you're supposed to report it immediately.

12

### F. Second Meeting with Supervisor Perry

A few days later, on October 7, Beal's doctor diagnosed him with a "[r]ight SLAP tear with anterior extension and instability" and placed him on the following restrictions: "No lifting with right arm > 10 lbs., no overhead lifting or pulling with right arm." [79-11]; [84] ¶ 24; [88] ¶ 41. The note stated Beal's next appointment would be on October 26. [79-11] at 1. The next day, Beal presented the note to Supervisor Perry. [84] ¶ 24. The parties dispute the details of what came next.

Beal testified that he requested light-duty work when he presented the doctor's note to Perry. *See* [79-1] at 195:2–16 ("I wasn't asking to be took off work, I was just asking to be able to work within my restrictions like whenever other employee had restrictions to do like answer the phone or continue to do my own job."); [88] ¶ 50. After presenting the note, he recalled, [79-1] at 202:6–11:

> [Perry] told me to step out of the office to let her make a phone call. I stepped out of the office. She called me back in and she said you have to go home because the transitioning work was only for employees who get hurt on the job... Light duty, what I call light duty.

Perry told him to "call ReedGroup." [79-1] at 293:10–11. Beal told Perry that he had already been told by ReedGroup that he could not file for short-term disability. [79-1] at 293:13–15 ("I said I already talked to Reed Group. They keep saying as long as I say I hurt myself on the job, I cannot file for short-term disability."). Perry told Beal to go home. [95] ¶ 19; [79-1] at 293:17.

According to Perry's version of events, Beal neither requested an accommodation nor mentioned that his right-shoulder diagnosis was related to an injury on duty. Perry testified, [79-10] at 104:5–12:

13

> I asked [Beal] what [the doctor's note] was for, and he -- all he said was his doctor have him on restrictions. So at that point I informed Mr. Beal that he can't work with restrictions. He has to open up a claim with the ReedGroup. So I told him that he needs to -- he couldn't complete his workday working with restrictions without any approval. So I told him to contact the ReedGroup and open up a claim and to contact me, and call me back with the claim number.[3]

She took a copy of the doctor's note, returned the original to Beal, then observed Beal leaving on his e-bike. [79-10] at 104:22–105:3. Perry believed that Beal "couldn't work" because it would be a "liability." [79-10] at 108:19–23 ("I told him that he needed to – that he couldn't work. I couldn't have… the liability on the floor working when the document stated that no lifting over your head."). Perry testified that Beal only referenced short-term disability leave in their conversation, so she referred him to ReedGroup.[4] *See* [79-10] at 65:13–23; [88] ¶¶ 46, 48.

## G. Absent without Leave

Beal left the maintenance shop after his conversation with Supervisor Perry. [95] ¶ 19. He did not return to work after October 8, did not return with a claim number from ReedGroup, and did not call in his absence every day. [88] ¶ 53. Beal

---

[3] Perry elaborated about the phone call she had in her office: "I called the admin manager and informed her that Mr. Beal has brought in a notification from his doctor that he was on a restriction, and that's when she stated that he would need to and I -- she just followed up with what I knew that he needed to do, what she stated that he needed to open up a claim with Reed." [79-10] at 113:9–14.

[4] Beal asserts that Supervisor Perry told him that "CTA would not allow him to work in the transitional work program because it was reserved for workers whom the CTA believed were injured on duty." [84] ¶ 25. He cites to the CTA's answer to the amended complaint, [45] ¶ 34, rather than Perry's deposition testimony. In its answer, the CTA denied that "[Beal] also requested work within CTA's transitional work program" (¶ 33) but admitted that "[Perry] notified [Beal] that CTA would not allow him to work in the transitional work program because it was reserved for workers whom CTA believed were injured on duty" (¶ 34). Perry's deposition testimony appears to contradict the CTA's denial and admission. As discussed below, the details of the conversation present a material dispute of fact. *See* IV.A.

testified that he believed he was placed on leave and that he was waiting on a determination for his workers' compensation claim. [79-1] at 300:12–15 ("I still had my job and I was waiting to be approved or denied from workers' comp claim.").

The CTA began sending "Five Day Letters" to notify Beal that he was "considered to be absent without leave (AWOL)." The CTA mailed letters on October 15, October 28, and December 27. *See* [89-25] at 28–31. The CTA considers an employee to be AWOL "if the employee is scheduled to work and fails to personally contact his or her immediate supervisor or designee by the end of his or her scheduled workday." [88] ¶ 9 (CTA's Corrective Action Guidelines). The letters were signed by administration manager Nikia Johnson and stated that Beal's failure to file a claim with ReedGroup violated the CTA's Administrative Policy 1010 (which applies to short-term disability for non-work related injuries), [89-25] at 28, 29, 30:

> It is alleged that on or about October 8, 2021, you arrived to the Desplaines [*sic*] Shop presented a doctor's note requesting that you be allowed to work with applicable TRTW restrictions; Upon receipt of this note your Senior Manager K. Perry notified you that you would not be allowed TRTW work/classification; because it is reserved for those persons specified as Injured On Duty. After this notification you were advised to leave the property and open a REED claim if you could not return to full duty work. As of October 15, 2021, you have failed to do so. Pursuant to CTA's Administrative Policy 1010, you have not met the required guidelines to support excusal of your continued absence, and have failed to supply medical documentation supporting a valid claim to the REED Group; as required by CTA policy and procedures, thereby rendering you non-compliant and subject to disciplinary action.

Each letter directed Beal to report to his work location for a meeting with Supervisor Perry, provide documentation to support his reason for not reporting, or submit a resignation. *See* [89-25] at 28–30.

15

The first two letters were sent via certified mail to Beal's previous address at 7726 Roosevelt Road. [89-25] at 28–29. The third letter was mailed via messenger to Beal's previous address at 1122 Circle Avenue. [89-25] at 30; [89-28] at 18 (email from Richard Owsiany to John Taylor requesting a skip trace for Beal; response from Taylor that the 1122 Circle Avenue address "shows to be current as of 10/07/21 and is likely still accurate"). Beal never received the five-day letters because he lived at 1510 Marengo Avenue.[5] [84] ¶ 10.

On October 15, John Taylor from CTA's legal team emailed Perry asking about Beal's reported injury. [95] ¶ 22. He asked whether "[Beal] is working now" and "if not, when was last day worked and has he filed for [short-term disability] for this current time?" [89-17] at 7–8. Two weeks later, Perry responded, [89-17] at 8:

> He is not working. His last day worked was 10/6/21. He reported to work on 10/8/21 with work restrictions and was informed that he could not work and would need to open a [short-term disability] claim. He has not opened a [short-term disability] claim as of 10/29/21.

The next time Perry spoke with Beal was on November 1. [95] ¶ 24. Perry called Beal's cell phone number to tell him that he needed to update his COVID vaccine information. *See* [79-10] at 131:20–132:14. Perry did not ask him about his absence or follow up on his short-term disability claim. [79-10] at 133:11–20. At this point,

---

[5] The CTA asserts that its rules required Beal to submit a change of address through the CTA's online Oracle system. [88] ¶ 18. Beal admits he never updated his address in the Oracle system, but he informed his supervisors of his 1510 Marengo Avenue address, for example, when calling in an absence from work. *See, e.g.*, [89-14] at 1 (absence call-in script dated March 24, 2020, signed by Manager Charles Walker and listing Beal's address as 1510 Marengo Avenue). The CTA's General Rule 19 states, "All employees must keep their supervisor advised of their current home address and telephone number." [89-4] at 5. The general rule does not limit notice to the Oracle system.

Perry knew that the CTA had attempted to send him five-day notices in October and that Beal had not responded. [79-10] at 133:7–10.

An administrative clerk from the Des Plaines shop called Beal's phone to leave him a voicemail about picking three holidays, and Beal asserts that he came into the shop in person on November 17 to select his holidays. [95] ¶ 25. Supervisor Perry was not in the manager's office, and she testified that she was unaware of Beal coming into the shop that day, or any other day. [79-10] at 137:1–20.

On December 23, Beal underwent right-shoulder rotator cuff surgery. [84] ¶ 29. After his surgery, Beal continued to communicate with the CTA's workers' compensation claim examiner: first on December 27 to provide an update on his surgery and inquire about the status of his claim, and then on January 18, 2022, to send his doctor's treatment notes from the previous year related to his fall. [95] ¶¶ 28–29.

## H.    Termination

On January 7, 2022, Supervisor Perry recommended Beal's discharge to the General Manager of Rail Maintenance Louis-Jean Jolicoeur. [88] ¶ 67; [72-23]. The recommendation summarized Beal's 64 consecutive absences from October 11, 2021, through January 7, 2022. [88] ¶ 67; [72-23] at 3. Perry cited Beal's violation of five CTA rules, including excessive absenteeism and not reporting for duty. [72-23] at 4. Perry's recommendation stated: "[Beal] has been absent without leave from October 11, 2021 until present. He has not provided any documentation to substantiate his continued failure to report for duty. His actions are in violation of the disciplinary guidelines of the Chicago Transit Authority General Rule Book. Therefore, based on

the aforementioned violation; it is recommended that Mr. Beal be discharged." [72-23] at 3.

Three days later, on January 10, General Manger Jolicoeur signed off on the notice of discharge. [88] ¶ 69. The notice was sent to Beal's previous 1122 Circle Avenue address via certified mail. [84] ¶ 30; [72-24] at 2. The notice of discharge stated: "You have been absent from work since October 8, 2021. The Chicago Transit Authority has made numerous attempts to contact you but to no avail. You have failed to contact the work location and failed to provide any documentation to substantiate your continued absence from work. As such you are considered absent without leave (AWOL)." [72-24] at 2.

Beal learned of his discharge a month later when he called Supervisor Perry because he was unable to log into the CTA's Oracle system. [88] ¶ 73. Perry told Beal that the CTA had terminated his employment. [88] ¶ 73.

## I. Reinstatement

Beal filed charges for disability discrimination with the Equal Employment Opportunity Commission on December 6, 2021; for retaliation on August 23, 2022; and for disability discrimination and retaliation on October 27, 2022. [84] ¶¶ 4–6. The EEOC issued right-to-sue letters, and Beal filed suit in this court naming the CTA and Supervisor Perry as defendants in March 2023. [1].

A month later, the CTA reinstated Beal to the same Rails Control Inspector position. [84] ¶ 34; [88] ¶ 3. During the gap between his termination and reinstatement, Beal says that he applied to "over a hundred" job postings for an

electrician position, interviewed with Metra and Ferrara Candy Co., and was unable to find another job. [84] ¶ 34; [79-1] at 277:10–278:21; [79-16] at 7.

## IV.  Analysis

### A.  Americans with Disabilities Act

The ADA prohibits disability discrimination by an employer. *See* 42 U.S.C. § 12112(a). "Discrimination can take the form of treating a disabled employee differently from other workers or failing to make reasonable accommodations to the known limitations of the employee." *Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1042 (7th Cir. 2020). Beal must show that he is a qualified individual with a disability to prove his failure-to-accommodate and disparate-treatment claims, but not for his retaliation claim. *See Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018); *Stanley v. City of Sanford, Fla.*, 145 S.Ct. 2058, 2064 (2025) ("Where § 12112(a) prohibits certain acts of employment discrimination against 'a qualified individual,' § 12203(a) prohibits retaliation against 'any individual' who opposes a discriminatory act.").

### 1.  *Failure to Accommodate*

To succeed on a failure-to-accommodate claim, Beal must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *Schoper v. Bd. of Trs. of W. Illinois Univ.*, 119 F.4th 527, 532 (7th Cir. 2024). "Relevant to—and sometimes determinative of—the third element is the employer and employee's respective cooperation in an interactive process to determine a reasonable

accommodation." *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019) (internal quotation marks omitted).

Both parties move for summary judgment on the failure-to-accommodate claim. Within the motions, only Beal moves for summary judgment on the disability element of the claim, [94] at 7, so I draw inferences in favor of the CTA on that question. The CTA moves for summary judgment on whether Beal was a qualified individual, [92] at 1 n.1, so I draw inferences in favor of Beal on that question.

1.      Disability

A disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual" or "a record of such an impairment." 42 U.S.C. § 12102(1)(A), (C). An impairment is a disability if it substantially limits a person's ability to "perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). An impairment "lasting or expected to last fewer than six months can be substantially limiting." *Id.* § 1630.2(j)(1)(ix). "Substantially limits" is "construed broadly in favor of expansive coverage." *Id.* § 1630.2(j)(1)(i); *see also* 42 U.S.C. § 12102(4)(A).

Beal asserts a physical impairment to his right shoulder that substantially limited his ability to lift. [77] at 9. Beal's doctor placed him on a weight restriction on October 7: "No lifting with right arm > 10 lbs., no overhead lifting or pulling with right arm." [79-11]; [84] ¶ 24; [88] ¶ 41. Lifting is a major life activity. *See* 42 U.S.C. § 12102(2)(A); *Frazier-Hill v. Chicago Transit Auth.*, 75 F.4th 797, 803 (7th Cir. 2023). A 10-pound weight restriction over several months is a substantial limitation on

20

lifting. *See* 29 C.F.R. pt. 1630, app. 1630.2(j)(1)(viii) ("[S]omeone with an impairment resulting in a 20-pound lifting restriction that lasts or is expected to last for several months is substantially limited in the major life activity of lifting.").

The CTA confuses the standard for establishing a "disability" under the statute—which compares a person's ability to the general population—with the standard for proving an employee is a qualified individual—which turns on their ability to perform the essential functions of the desired job. *See* [85] at 3–7; *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013). There's no dispute that Beal had a physical impairment to his right shoulder that resulted in a 10-pound weight restriction or that the weight restriction substantially limited his ability to lift. Beal was disabled as a matter of law when he presented his restrictions to Supervisor Perry.

But the record is not clear whether—or to what degree—Beal's impairment persisted through January 10, 2022, when the CTA discharged Beal. [88] ¶ 69. It's unlikely that Beal's physician lifted those restrictions after Beal's shoulder surgery on December 23, but the doctor's note made no mention of how long the lifting restriction was expected to last after surgery. Viewing the facts in a light favorable to the CTA, a reasonable jury could conclude that Beal's physical impairment was not expected to last through January 10, 2022. *See, e.g., Frazier-Hill,* 74 F.4th at 803 (finding that an employee's report of difficulty lifting in 2016 was insufficient to support a jury finding that the employee was disabled two years later absent evidence of a continued restriction). Whether Beal had a qualifying disability

21

throughout the entire period is not clear as a matter of law, so Beal's motion for summary judgment on the issue of disability is denied.

Beal also claims a "record of" disability based on his shoulder injury starting January 15, 2021 (when he fell into the pit).[6] [77] at 10. An employee has a "record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). This includes employees "who have recovered from previously disabling conditions… but who may remain vulnerable to the fear and stereotypes of their employers." *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 (7th Cir. 1998). Beal continued to work without restrictions after returning from sick leave on February 1, 2021, and he did not have a weight restriction in place until his October 7 appointment. [84] ¶¶ 17, 19; [88] ¶¶ 30–31. He does not point to evidence suggesting his shoulder injury substantially impaired his ability to lift before October 7. Viewing the facts in a light favorable to the CTA, a reasonable jury could find that Beal did not have a "record of" a disability.

### 2.      Qualified without Reasonable Accommodation

A qualified individual "can perform the essential functions" of their job "with or without reasonable accommodation." 42 U.S.C. § 12112(8). The CTA's

---

[6] Beal also argues that he had a "record of" impairment based on his chronic medical conditions including Sjögren's Syndrome, lymphoma, and Raynaud's Syndrome. [77] at 10–11. That argument is foreclosed because Beal failed to plausibly connect any physical impairments related to Sjögren, lymphoma, and Raynaud's with substantial limitations on a major life activity. *See Beal v. Chicago Transit Auth.*, No. 23 CV 1387, 2023 WL 6461413, at *3 (citing 29 C.F.R. § 1630.2(k)(1)). Nothing in the developed record suggests he meets that burden at summary judgment.

understanding "of the essential functions of the job is [presumed] correct, unless [Beal] offers sufficient evidence to the contrary." *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010). Whether lifting is an essential function of a job "is a factual question, *not* a question of law." *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022) (emphasis in original).

Beal was unable to perform the essential functions of the Rails Control Inspector position when he presented his doctor's note to Supervisor Perry. A control inspector must inspect, repair, or replace various control components in rail cars and perform other assigned maintenance tasks. [88] ¶ 5; [93] ¶ 1. To perform inspections and maintenance, a control inspector must be able to remove and replace covers approximately six feet long, weighing at least 15 to 20 pounds. [88] ¶ 6; [93] ¶ 2. The CTA asserts that control inspectors must also use their arms to lift their body weight when exiting the pit, and in some instances, board or deboard trains using their arms. [88] ¶ 7. But Beal attests that he was able to enter and exit the pit using stairs and that he did not have to board or deboard trains. [89-1] ¶ 4. Ultimately, this dispute is not material. Beal's doctor placed him on a 10-pound weight restriction, so he was unable to lift 15 to 20-pound control covers. The parties agree that a Rails Control Inspector must be able to lift control covers, and no one suggests that control covers can be safely lifted with one arm. No reasonable jury could find that Beal was qualified to perform the essential functions of the job without an accommodation. *See Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020) (recognizing that whether a handler was required to lift packages weighing "closer to 16 or 75 pounds

23

above the shoulder—or even just 6 pounds with more than limited frequency… might be up for debate," but finding summary judgment appropriate where the employee failed to prove qualifications under either job description).

### 3. Qualified with Reasonable Accommodation and the Interactive Process

A reasonable accommodation allows the employee to "perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Reasonable accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position... and other similar accommodations." *Id.* § 12111(9)(B). A plaintiff bears the initial burden of proving that the accommodation they seek is "reasonable on its face." *Majors*, 714 F.3d at 534. If the proposed accommodation is reasonable, the employer bears the burden to prove that the accommodation would create an undue hardship. *Id.* at 535.

"An employee begins the accommodation process by notifying [their] employer of [their] disability; at that point, an employer's liability is triggered for failure to provide accommodations." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (internal quotation marks omitted). Once an employer is put on notice of a disability, the employer must "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Id.*; 29 C.F.R. § 1630.2(o)(3) (the purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations"). Failure to engage in the interactive process "is not an independent basis for liability," *Spurling*, 739 F.3d at

24

1062, because the interactive process is a means rather than an end itself, *Sansone*, 917 F.3d at 980.

The CTA never offered Beal temporary light-duty work through the Transitional Return to Work Program, and Beal never filed an accommodation request with the CTA's Accommodation Review Committee. [88] ¶ 52. No accommodation was arranged or discussed after Beal's meeting with Supervisor Perry on October 8. "[W]hen a reasonable accommodation was possible and the employer did not offer it… 'responsibility will lie with the party that caused the breakdown.'" *Sansone*, 917 F.3d at 980 (internal citation omitted). "Both parties are required to make a good faith effort to determine what accommodations are necessary, but if a breakdown of the process occurs, courts should attempt to isolate the cause and then assign responsibility." *Kinsella v. Baker Hughes Oilfield Operations, LLC*, 66 F.4th 1099, 1105 (7th Cir. 2023) (cleaned up).

Before assigning responsibility, a court must "first look at whether there is a genuine issue of material fact regarding the availability of a vacant position to accommodate." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 295 (7th Cir. 2015) ("[E]ven when the employer fails to adequately interact, a plaintiff must come forward with non-speculative evidence showing that a reasonable accommodation could be made that would enable her to carry out the essential functions of [their] job."). An employer is "not required to create a light-duty position for an employee with a disability as a reasonable accommodation." *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495,

506 (7th Cir. 2020); *see also Gratzl*, 601 F.3d at 680 ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee."). But "if an employer has a policy of creating light-duty positions for employees who are occupationally injured, then that same benefit ordinarily must be extended to an employee with a disability who is not occupationally injured unless the company can show undue hardship." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) (citing EEOC Enforcement Guidance: Workers' Compensation & the ADA (Sept. 3, 1996), 1996 WL 33161342, at *12).

Beal contends that the CTA's failure to offer him temporary light-duty work when it had a generally applicable policy violates the CTA's duty to accommodate as a matter of law. [92] at 4–7. But the CTA's policy is couched in discretion—transitional work "may be available" and the "employee's department will determine whether TRTW assignments are available." [79-13] at 3. In *Severson*, the court found that an employer did not have "a policy of providing light-duty positions" where the company's Return to Work manual "retained the option, in its discretion, to give occupationally injured employees temporary duties on an ad hoc basis if such work was available." 872 F.3d at 482. The existence of the CTA's Transitional Return to Work program is not dispositive of whether light-duty work was available to Beal.

On the latter question, there's a material dispute of fact as to whether light-duty work "was readily available." *Spurling*, 739 F.3d at 1062. Beal testified that two of his colleagues in the maintenance department performed administrative tasks like answering phone calls or separating nuts and bolts, though he also conceded being

unaware if those colleagues had any medical work restrictions. [88] ¶ 17. He also testified that he would have been able to perform those tasks because it did not require lifting above 10 pounds. *See* [79-1] at 196:13–197:6. Though the CTA disputes the existence of such light-duty work, it does not dispute Beal's qualifications to perform those basic tasks with his weight restriction. *See* [85] at 12.

Beal also relies on testimony from former Senior Manager Jeff Bell who supervised Beal from 2011 until May 2021 at the Des Plaines maintenance shop. [84] ¶ 31. Former Manager Bell corroborates that there was almost always some form of light-duty work of the kind Beal identified. *See* [79-12] at 57:13–58:19. Bell agreed that the program would be available only for employees "that made CTA aware that their restrictions were based on an injury on duty." [79-12] at 58:17–19.

The CTA presents conflicting testimony from General Manager Jolicoeur. [88] ¶ 40. Jolicoeur testified that no light duty work program existed in the maintenance department in 2021. [89-27] at 68:21–24.[7] The CTA objects that former-Manager Bell's testimony should be disregarded as speculative because he was not the senior manager of rail maintenance when Beal presented his work restrictions. [84] ¶ 31. But former-Manager Bell didn't testify that he knew light-duty work existed in the

---

[7] General Manager Jolicuer testified, [89-27] at 68:21–24:

> Q. Workers didn't, from time to time, paint, or sweep, or do clean-up jobs if they had some restrictions on them?

> A. No, no.

> Q. Okay. So do you believe the rule at CTA was just "no light duty at all"? Is that your understanding?

> A. That's in -- in our department, no. In our department, no.

maintenance department after he retired; his testimony is based on personal knowledge as Perry's predecessor in the senior manager role. Beal raises genuine factual disputes as to the availability of light-duty work in the maintenance department and his qualifications to perform the work. Resolving these disputes implicate conflicting testimony and witness credibility, so summary judgment is inappropriate. *See Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2014).

If a jury finds that light-duty work was available and Beal was qualified to perform the essential functions of the job with that accommodation, then there's sufficient evidence in the record for a jury to further conclude that the CTA failed to reasonably accommodate Beal through the interactive process. The core of the dispute rests on conflicting accounts of the October 8 meeting when Beal presented his doctor's note to Supervisor Perry.

Beal testified that he specifically requested light-duty work, but Perry told him that "transitioning work was only for employees who got hurt on the job." [79-1] at 195:2–16, 202:1–11. He told Perry that he had already filed a short-term disability claim with ReedGroup but had been denied because the injury occurred on duty. *See* [79-1] at 293:13–15.

Perry testified that Beal only presented his doctor's note; he did not request to work with restrictions or inquire about light-duty work. [79-10] at 122:5–7 ("The interaction with Mr. Beal was brief. He gave me the documentation. The only thing he stated was his doctor have him on restrictions."). She says she did not tell Beal

28

about the transitional work program because Beal did not inform her that he had an injury on duty. [79-10] at 121:9–19. She did not tell him to submit an accommodation request through the Accommodation Review Committee because he only mentioned short-term disability—something handled by ReedGroup. [79-10] at 121:23–122:7.

A plaintiff must "normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). But this initial duty "requires at most that the employee indicate to the employer that she has a disability and desires an accommodation." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005). There are no "magic words" that an employee must invoke to put their employer on notice. *See Bultemeyer v. Ft. Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("[P]roperly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation[.]' The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help."). An employee can provide notice by presenting their supervisor with a doctor's note explaining a medical condition and specifying an accommodation. *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d at 804 (a reasonable jury could conclude that employer was aware of an employee's condition based on doctor's notes indicating she suffered from neuropathy and a request to use a "shortcut" at work, thereby triggering the employer's obligation to engage in the interactive process). An employee doesn't need to request an accommodation with

perfect clarity. "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Id.*

If a jury accepts Beal's version of the facts and finds that he specifically requested light-duty work for an injury on duty, then Perry was on notice of Beal's need for an accommodation and the CTA had a duty to engage in the interactive process. That, the CTA did not do. Perry did not ask questions about Beal's injury on duty or request additional medical information from Beal to explore if he was eligible for the Transitional Return to Work Program. *See* [79-10] at 121:9–19; *see also* [79-13] at 4 ("CTA will use its best efforts to assign the employee to the employee's prior work location and shift. Depending on CTA's business needs, the TRTW assignment may be in a different department or on a different shift than worked at the time of injury."). Of course, the maintenance department retained discretion under CTA policy to determine the availability of transitional work assignments. *See* [79-13] at 3. But no further discussions with Beal occurred after October 8. *See* [79-10] at 66:8–12 (Perry testifying that she did not follow-up with Beal because she "was not allowed to call an employee inquiring" about their medical condition and that she "gave [Beal] the information that he needed to follow-up").

"[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d at 804. Supervisor Perry's caution may have

been reasonable in some circumstances, but a reasonable jury could conclude that the burden fell on the CTA to follow up with Beal once it knew of his physical limitations and desire for light-duty work. *See Rowlands v. UPS-Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

The CTA argues that, in any event, Perry "guided" Beal "towards the interactive process" by directing him to file a claim with ReedGroup and return with a claim number. [71] at 9. Unfortunately, Perry gave Beal incorrect information. The CTA's Accommodation Review Committee—not its third-party disability and FMLA administrator ReedGroup—reviews accommodation requests. [79-15] at 3; [89-30] at 25:24–26:6. The CTA asserts that ReedGroup provides contact information of the Accommodation Review Committee for employees seeking an accommodation. [88] ¶ 47. But the CTA's accommodation policy provides that: "If a manager receives a request from an employee for a reasonable accommodation in relation to a medical condition and/or disability, or **becomes aware of an employee's possible need for an accommodation**, the manager should direct the employee to the ARC and notify the ARC of the employee's request or need via email." [79-15] at 3 (emphasis included). A reasonable jury could conclude that Perry was put on sufficient notice to direct Beal to the CTA's accommodation review process. In turn, Perry's failure to refer Beal as suggested by CTA policy—independent of her failure to consider Beal for light-duty work through the Transitional Return to Work Program—effectively shut down the interactive process and the possibility of identifying a reasonable alternative accommodation. *See Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th

31

Cir. 2005) (recognizing there's no "hard and fast rule" for assigning responsibility when a breakdown occurs and noting that asymmetrical access to information may be a consideration). Viewing the facts in a light favorable to Beal, a jury could conclude that the CTA failed to explore the feasibility of a reasonable accommodation with Beal.

Summary judgment in favor of either party is inappropriate. There are too many factual disputes based on conflicting witness testimony that must be resolved by a jury: whether Beal had a qualifying disability when he was terminated, whether he was qualified to perform light-duty work with his medical work restriction, the availability of light-duty work in October 2021, whether the CTA was put on sufficient notice to engage in the interactive process, and ultimately, whether the CTA failed to reasonably accommodate Beal. The parties' cross-motions on the failure-to-accommodate claim are denied.

2. *Disparate Treatment*

To prove disparate treatment, Beal must show that he (1) had a disability, (2) was otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation, and (3) the CTA took an adverse employment action because of his disability. *Hoffstead v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 132 F.4th 503, 510 (7th Cir. 2025). The same analysis under a failure-to-accommodate claim applies to the first two elements. Here, the causation element is in dispute.

The CTA invokes the *McDonnell Douglas* burden-shifting framework. [71] at 3–9. Beal opts to go the route of *Ortiz*, [87] at 9, so I consider the evidence as a whole to determine "whether a reasonable jury could find that the relevant decision was

motivated in part by an unlawful criterion." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)); *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891–92 (7th Cir. 2025). (cautioning that the burden-shifting framework "may have limited value as a heuristic when a plaintiff has not taken that approach to presenting his case"). Under *McDonnell Douglas* or *Ortiz*, whether Beal was meeting the CTA's legitimate expectations overlaps with the question of pretext. *See Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022).

Beal points to two adverse actions: (1) removal from work and placement on an "unpaid and unwanted leave" on October 8, 2021, and (2) his discharge on January 10, 2022. *See* [87] at 9 n.4. Beal's termination was an adverse employment action, but the CTA disputes that an "hours-long" removal from service rises to that level. [94] at 7. Drawing inferences in favor of Beal, a reasonable jury could find that Supervisor Perry effectively put Beal on unwanted leave by sending him home and ordering him to apply for short-term disability. *See Brooks v. City of Pekin*, 95 F.4th 533, 539 (7th Cir. 2024) ("[P]lacement on unpaid leave [is] an adverse employment action.").

Supervisor Perry prepared a recommendation for Beal's discharge, and General Manager Jolicoeur signed off on the notice of discharge. [88] ¶¶ 67, 69. Beal invokes the cat's paw theory of liability to connect Perry's alleged bias and animus to General Manager Jolicoeur's termination decision. [87] at 15; *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021). The CTA may avoid liability if General Manager

Jolicoeur was not "wholly dependent on a single source of information and conduct[ed] [his] own investigation into the facts relevant to the decision." *Sinha*, 995 F.3d at 574. Apart from asking Perry about Beal's AWOL status, General Manager Jolicoeur did not conduct any independent investigation before approving the recommendation. *See* [88] ¶ 70.

But Beal does not create a genuine issue of material fact that Supervisor Perry's reason for sending Beal home was dishonest. Pretext is "a lie, specifically a phony reason for some action" or "deceit used to cover one's tracks." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025) (citations omitted). If an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *Brooks,* 39 F.4th at 435. To meet his burden, Beal "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the CTA's "asserted reasons that a reasonable person could find it unworthy of credence." *Murphy*, 140 F.4th at 914 (internal quotation marks omitted).

Perry's proffered reason for sending Beal home was that he could not safely work in the maintenance department with medical work restrictions. *See* [71] at 10; [79-10] at 108:22–109:6. Workplace safety is a legitimate, nondiscriminatory reason for an employer to act. *See Ismail v. Brennan*, 654 Fed. App'x 240, 244–45 (7th Cir. 2016). Beal admits that he could not safely lift more than 10 pounds with his medical weight restrictions. [84] ¶ 24. Perhaps Perry acted too quickly without considering whether a reasonable accommodation could be fashioned to allow Beal to safely work,

but that's not enough to suggest her safety concern was dishonest. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016) ("A court is not a 'super personnel department that second-guesses employers' business judgments.'"). No reasonable jury could find that Perry's safety rationale for sending Beal home was pretextual.

The CTA says that it terminated Beal because he was absent without leave from October 11, 2021, until January 7, 2022, for a total of 64 consecutive unexplained absences. [88] ¶ 67. The CTA considers an employee AWOL "if the employee is scheduled to work and fails to personally contact his or her immediate supervisor or designee by the end of his or her scheduled workday." [88] ¶ 9. Beal concedes that he did not report to work or call in his absences after he left the Des Plaines maintenance shop on October 8. [88] ¶ 53.

To start, Beal argues that his absences and AWOL status were caused by the CTA's failure to accommodate him with light-work duty, so his termination was "because of" his disability. [87] at 10 (citing *Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 418 (6th Cir. 2020)). The cited cases involve failure-to-accommodate claims, which do not require a showing of pretext because the denial of a reasonable accommodation is the discriminatory act itself. *See Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 638 (7th Cir. 2020). For disparate-treatment claims, an employee's absenteeism or failure to follow rules can be a legitimate, nondiscriminatory reason for termination even if it is caused by an employee's disability. *See Stelter v. Wisconsin Physicians Serv. Ins. Corp.*, 950 F.3d 488, 491 (7th Cir. 2020) ("The ADA

35

does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability.") (citation omitted); *cf. Felix v. Wisconsin Dep't of Transportation*, 828 F.3d 560, 574 (7th Cir. 2016) ("[A]n employer may… terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability.").

Additionally, Beal points to record evidence of pretext that misplaces the focus of the inquiry. For example, he asserts that Perry did not tell him to report back with a claim number or return to work on his next scheduled day, so he did not know Perry expected him to return. [87] at 2. He also says he wasn't aware of—or trained on— various CTA procedures on leave and accommodation. *See* [88] ¶¶ 11–12, 15, 23. The focus of the pretext inquiry is not whether Beal honestly believed he was complying with Perry's orders or whether Perry mistakenly directed Beal to file a short-term disability claim when he was ineligible for it. *See Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 505 (7th Cir. 2017) ("Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer."). The question is whether Perry honestly believed that Beal was absent without leave. *Id.*

Beal raises two key issues on that question: (1) the CTA's mailing of five-day letters to Beal's previous addresses when it had access to his "correct" address and (2) Supervisor Perry's ability to contact Beal about his AWOL status and her failure to do so.

Beal never updated his 1510 Marengo Avenue address in the CTA's online system, so the CTA mailed his five-day letters to outdated addresses. *See* [84] ¶ 10;

[89-25] at 28–30. Beal suggests the CTA could have made better efforts to locate his current address, including contacting his former supervisors or reaching out to the workers' compensation team to confirm his mailing and email addresses. [87] at 4–5. An employer's failure to follow its customary procedures can support an inference of pretext. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 931 (7th Cir. 2020).

But there is no evidence that the CTA deviated from its normal policy of contacting employees. Beal relies on General Rule 19, which provides: "All employees must keep their supervisor advised of their current home address and telephone number." [89-4] at 5. Beal says that he complied with this rule, so the CTA should have checked his personnel file to find his current address. His arguable compliance with a rule applying to employees doesn't mean the CTA deviated from its own procedure in contacting Beal. And the record suggests that Beal's own mistakes contributed to the confusion: despite submitting change-of-address slips in the past, Beal forgot to submit one with his recent move. [88] ¶ 20. Although the CTA's third-party leave and workers' compensation administrators mailed letters to his current address, Beal concedes that the CTA never sent him letters at the address (suggesting it didn't know his new address and was not deliberately misdirecting its notices). [88] ¶ 20. Even if the CTA mistakenly mailed letters to Beal's old addresses and could have rectified it with minimal effort, an "honest mistake, however dumb" is not pretextual. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).

In any event, nothing in the record suggests that Supervisor Perry or General Manager Jolicoeur knew about Beal's updated address and continued to send the five-

day letters to outdated addresses. Neither were responsible for mailing the letters and confirming Beal's correct address, and Beal doesn't point to evidence suggesting discriminatory animus on the part of non-decisionmakers to support a cat's paw theory of liability. *See Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 273 (7th Cir. 2023) (a plaintiff invoking the cat's paw theory of liability must show that the biased subordinate "actually harbored discriminatory animus against" him and "the subordinate's input was a proximate cause of the adverse employment decision") (cleaned up); [89-25] at 18 (email from Richard Owsiany to John Taylor requesting a skip trace for Beal; response from Taylor that the 1122 Circle Avenue address "shows to be current as of 10/07/21 and is likely still accurate").

Beal points to other evidence in the record to suggest that he was in communication with Supervisor Perry, but they do not support an inference of pretext. On November 1, Perry called Beal to discuss his COVID vaccine status, but she did not inquire about his failure to return to work or inform him of his AWOL status. [88] ¶ 62. When asked why she did not follow up with Beal, Perry explained that she did not want to ask about potential medical information. [88] ¶ 62; [79-10] at 66:2–12 ("Because when I'm not allowed to call an employee inquiring about their -- whatever their sick is, if he -- I gave him the information that he needed to follow-up and do, whether or not he chose to do it that was Mr. Beal's responsibility to follow-up and do that information."). Before approving Supervisor Perry's recommendation for discharge, General Manager Jolicoeur had a conversation with Perry about Beal's

AWOL status [89-27] at 30:2–12. Perry confirmed with Jolicoeur "there was no call" with Beal. [89-27] at 30:12.

Perry and Beal's call on November 1 does not undermine the honesty of Perry's belief that Beal was noncompliant with the CTA's AWOL policy. Perry did not lie to Jolicoeur about Beal's failure to call in every workday or cover up facts suggesting that Beal was in fact compliant with the absenteeism policy. It's undisputed that Beal did not call in his absences every day. "If the employer honestly believed it made the correct employment decision—even if its decision was inaccurate, unfair, foolish, trivial, or baseless—the plaintiff's claims cannot succeed." *Upchurch v. Indiana*, No. 24-1355, 2025 WL 2088910, at *4 (7th Cir. July 25, 2025) (internal quotation marks omitted). Viewing the facts in a light favorable to Beal, no reasonable jury could find that Perry's reason for recommending Beal's termination based on AWOL status was pretext for discrimination.

### 3. *Retaliation*

To succeed on a retaliation claim, Beal must show: (1) he engaged in statutorily protected activity; (2) the CTA took adverse action against him; and (3) the protected activity caused the adverse action." *Brooks*, 95 F.4th at 539; *see also Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) ("[C]ourts look to Title VII retaliation cases for guidance in deciding retaliation cases under the ADA."). An employee engages in a protected activity under the ADA by opposing an unlawful practice or filing a charge of discrimination. *See* 42 U.S.C. § 12203(a). The ADA's retaliation provision does not extend to "activities protected only by other antidiscrimination

39

laws." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055–56 (7th Cir. 2024). For retaliation claims, an action is adverse if it "would have 'dissuaded a reasonable worker from' engaging in protected activity." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023). To prove causation, Beal must demonstrate that "the protected conduct was a substantial or motivating factor in the [CTA's] decision." *Id.* Suspicious timing or evidence of pretext may provide circumstantial evidence of causation. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022).

The CTA does not dispute that Beal engaged in protected activities by: (1) requesting an accommodation with Supervisor Perry on October 8, 2021, and (2) filing a charge of disability discrimination with the EEOC on December 6, 2021. [71] at 10; [84] ¶ 4. Beal claims that his same-day removal from work (characterized as forced leave) and his termination on January 10, 2022, constitute adverse employment actions. [87] at 14.

Beal's retaliation claim fails for the same reason as his disparate-treatment claim. Assuming removal from work is a materially adverse action in the retaliation context,[8] Perry sent Beal home after he presented his work restrictions because she

---

[8] In *Muldrow v. City of St. Louis*, 601 U.S. 346, 348 (2024), the Supreme Court rejected a significant-harm standard under Title VII's antidiscrimination provisions but did not disturb the more demanding "materially adverse" standard under the statute's anti-retaliation provisions. Accepting Beal's characterization of forced leave rather than the CTA's characterization of removal from work, I assume that such a removal would qualify as an adverse action under the ADA's retaliation provision. *See Brooks v. City of Pekin*, 95 F.4th at 539 (treating unpaid leave as an adverse action for both disparate-treatment and retaliation claims under the ADA); *but see Koty v. DuPage Cnty., Illinois*, 900 F.3d 515, 521 (7th Cir. 2018) (holding that an employee's "temporary move to inactive status" after the employee reported hip pain and requested an accommodation did not constitute an adverse employment action to support an ADA retaliation claim).

believed he could not safely work, and Beal offers no evidence in the record to challenge the sincerity of that belief.[9] *See* [79-10] at 108:22–109:6. And Beal's evidence of retaliatory pretext for his termination falls short for the reasons discussed above. Supervisor Perry had a legitimate, nondiscriminatory reason for reporting Beal as absent without leave, and nothing in the record suggests her belief of Beal's noncompliance was dishonest. No reasonable jury could infer retaliatory motive behind the CTA's termination decision.

Beal also asserts retaliatory termination based on his EEOC charges, but only one of the charges predated his termination. Beal filed a charge for disability discrimination on December 6, 2021. [84] ¶ 4. He does not dispute that neither Supervisor Perry nor General Manager Jolicoeur knew about the filed charge. [71] at 12; [87] at 14–15. Without knowledge, no reasonable jury could find the CTA terminated Beal in retaliation for his EEOC charge. *See Kotaska*, 966 F.3d at 633 ("A valid retaliation claim requires that the decisionmaker know of the protected activity.").

## B. Family and Medical Leave Act

The FMLA guarantees eligible employees up to twelve weeks of unpaid leave when the employee has a serious health condition that renders them unable to

---

[9] Alternatively, Beal's claim for retaliation based on forced leave is duplicative of his failure-to-accommodate claim. Under Beal's theory of the case, he was sent home by his supervisor instead of being offered light-duty work. The adverse action was the refusal of his preferred accommodation of light-duty work for forced leave—it is no different than his failure-to-accommodate claim. *See Koty v. Zaruba*, No. 15-cv-2600, 2017 WL 4150684 (N.D. Ill. Sept. 19, 2017), *aff'd sub nom. Koty v. DuPage County, Illinois*, 900 F.3d 515 (7th Cir. 2018 (collecting cases on dismissals of ADA retaliation claims that are "simply repackaged" failure-to-accommodate claims).

perform their position. 29 U.S.C. § 2612(a)(1)(D). It's unlawful for an employer to "interfere with, restrain, or deny" an employee's exercise of rights under the statute and to "discharge or in any other manner discriminate against any individual for opposing any practice" prohibited by statute. *Id.* § 2615(a).

### 1. Interference

To succeed on an interference claim, Beal must show that (1) he was eligible for FMLA protections; (2) the CTA was covered by the FMLA; (3) he was entitled to take leave; (4) he provided sufficient notice of his intent to take leave; and (5) the CTA denied him FMLA benefits to which he was entitled. *See Davis v. Illinois Dep't of Hum. Servs.,* 137 F.4th 641, 648 (7th Cir. 2025). The CTA concedes the first two elements. *See* [71] at 13.

The CTA's third-party administrator ReedGroup approved Beal for intermittent FMLA leave from July 14, 2021, to January 11, 2022, for medical conditions related to his fall and Sjögren's Syndrome. [84] ¶ 21; [79-3]. ReedGroup approved Beal for: (1) up to two 16-hour absences a month in the "Incapacity/Unspecified" category and (2) up to three 2-hour absences a month in the "Office Visit" category. [79-3] at 1–2. As of October 8, 2021, Beal had 372.5 hours or 8.76 weeks of intermittent FMLA leave remaining. [79-3] at 1. ReedGroup's letter stated that "any future absences reported… which exceed the requested frequency and/or duration… may be subject to recertification or denial." [79-3] at 2. On October 4, CorVel (CTA's third-party administrator for workers' compensation claims) notified Beal that if his workers' compensation claim was approved, he would receive automatic FMLA approval for injury-on-leave duty. [79-9] at 1.

42

The parties can't seem to agree on what this dispute is about. The CTA asserts that Beal was only approved for intermittent leave, which would not cover his 64 consecutive absences between October 11, 2021, and January 7, 2022. [88] ¶ 67. And in any event, Beal did not give sufficient notice to take leave or follow the CTA's procedure for reporting absences. [71] at 13–14. Sidestepping the issue of entitlement and notice, Beal advances a misclassification theory of interference. [87] at 15. Beal concedes that he did not request leave when he presented his doctor's note to Supervisor Perry on October 8. [88] ¶ 50. But the CTA unilaterally placed him on unwanted leave, which created the need for protected FMLA leave, and so his termination for the alleged missed days should have been protected. [87] at 17.

An employee doesn't need to expressly request FMLA leave to invoke its protections, *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015), but they must provide sufficient notice "to make the employer aware that the employee needs FMLA-qualifying leave" including the "anticipated timing and duration of the leave." 29 C.F.R. § 825.301(b). Then, "[o]nce approved for FMLA leave, an employee must give proper notice when taking protected leave." *Davis*, 137 F.4th at 644. An employer may require an employee to comply with its "usual and customary notice and procedural requirements" for requesting time off. *Id.* at 645. Approval of FMLA may be delayed or denied if an employee fails to abide by their employer's notice requirements, absent unusual circumstances. *Id.*

Beal admits that he did not ask for leave during his October 8 meeting with Supervisor Perry, even though he knew at the time that he was eligible for

43

intermittent leave. *See* [88] ¶¶ 49–50; [79-1] at 194:23–195:1 ("No leave, I wasn't asking to be taken off work.") & 195:13–16 ("I wasn't asking to be took off work, I was just asking to be able to work within my restrictions like whenever other employee had restrictions to do like answer the phone or continue to do my own job.").

Beal's admission forecloses his claim of interference. In *Ridings v. Riverside Medical Center*, an employee initially alleged FMLA interference because she "did not desire to take medical leave under FMLA, and [her employer] attempted to force her to take leave." 537 F.3d 755, 769 n.3 (7th Cir. 2008) (internal quotation marks omitted). The court noted that "[i]f an employee does not wish to take FMLA leave but continues to be absent from work, then the employee must have a reason for the absence that is acceptable under the employer's policies, otherwise termination is justified." *Id.* Similarly in *Dotson v. BRP U.S. Incorporated*, the court found an employee's argument "that he was forced to use FMLA leave" to be "particularly unusual" because if the employee "was not taking FMLA leave, then he would have needed to provide some other reason to excuse his absence, a reason allowed by [his employer's] absenteeism policy." 520 F.3d 703, 708 (7th Cir. 2008); *see also Bailey v. Sw. Gas Co.*, 275 F.3d 1181, 1186 (9th Cir. 2002) ("Because [the employee] never sought to invoke her FMLA rights, she may not now argue that [her employer] interfered with the exercise of her rights by suggesting the FMLA might apply, providing her with information on it, and seeking a medical certification of her condition.").

Accepting Beal's version of the facts, he remained at home waiting for a determination on his workers' compensation claim (rather than ignoring Supervisor Perry's order to file a claim with ReedGroup). *See* [79-1] at 300:13–15 ("I still had my job and I was waiting to be approved or denied from workers' comp claim."). Even if Beal's time off would later be designated as injury-on-duty leave by the CTA's workers' compensation administrator, Beal was still subject to the CTA's attendance policy and absence requirements all the same. The CTA's Corrective Action Guidelines requires an employee to "personally contact his or her immediate supervisor or designee by the end of his/her scheduled workday." [88] ¶ 9. "Fulfillment of this requirement to contact the work location does not necessarily excuse the absence." [88] ¶ 9. Beal did not comply with the CTA's absence call-in procedures.

Beal cites *Verhoff v. Time Warner Cable, Inc.*, 478 F.Supp.2d 933 (N.D. Ohio 2006), to support his theory of misclassification. [87] at 17–18. There, the employee asserted that "instead of the block leave he received, he should have been given intermittent leave" and "[h]ad such leave been provided… his schedule could have been adjusted to enable him to work no more than forty hours per week." 478 F.Supp.2d at 941. But that case involved an employer failing to offer reduced leave after receiving sufficient medical information from the employee's doctor that a reduced schedule would enable him to work. *Id.* Here, ReedGroup approved Beal for intermittent leave from July 14, 2021, to January 11, 2022, for his fall and Sjögren's Syndrome. [88] ¶ 67. If Beal wanted to invoke intermittent leave to cover his

45

absences, then he was required to follow the CTA's procedures by reporting absences to ReedGroup, who would then forward absence notifications to his work location. *See* [88] ¶ 58. He did not follow that policy.

Viewing the facts in a light favorable to Beal, no reasonable jury could find that Beal provided sufficient notice of his intent to take FMLA-protected leave or that the CTA interfered with his rights when Beal failed to comply with its absence policies. The CTA's motion for summary judgment on the interference claim is granted.

### 2. *Retaliation*

To succeed on a claim for retaliation, Beal must prove that he engaged in a protected activity, the CTA took an adverse action against him, and a casual connection between the two. *See Brooks*, 95 F.4th at 539; *see also Ziccarelli v. Dart*, 35 F.4th 1079, 1091 (7th Cir. 2022) (analyzing FMLA retaliation claims under the same framework as federal antidiscrimination laws).

Beal asserts retaliation for engaging in FMLA-protected activity including requesting, being approved for, and taking "numerous days of FMLA leave between 2020 and October 8, 2021 in connection with his non-work related serious health conditions." [87] at 19. Apart from vaguely referencing FMLA-protected leave sometime between 2020 and October 2021, Beal does not attempt to distinguish between these periods of leave, identify which decisionmakers had knowledge of the leave or requests for leave, and point to evidence suggesting a causal link. Beal's vagueness is fatal to his claim because Perry was not yet Beal's supervisor when he

46

fell into the pit on January 15, 2021, or when he took two weeks of sick leave through February 1. *See* [88] ¶ 30 (Beal told then-Senior Manager Jeff Bell that he fell into the pit on January 19). Beal also concedes that General Manager Jolicoeur was unaware of any of Beal's FMLA leave, requests, or short-term disability claim. [88] ¶¶ 25–26. Without evidence of knowledge and the requisite causal link, no reasonable jury could find that Beal's removal from work or termination was in retaliation for engaging in FMLA-protected activity. *See Kotaska*, 966 F.3d at 633. The CTA's motion for summary judgment on the FMLA retaliation claim is granted.

## C. Illinois Workers' Compensation Act

The IWCA prohibits an employer from terminating an employee because of their "actual or anticipated exercise of workers' compensation rights." *Hillmann v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016). To prove retaliatory discharge, Beal must establish that: (1) he was employed by the CTA at the time of his injury; (2) he exercised a right granted by the IWCA; and (3) his discharge was causally related to the exercise of his rights under the IWCA. *Id.* (citing *Grabs v. Safeway, Inc.*, 395 Ill.App.3d 286, 291 (1st Dist. 2009)). "But-for" causation is insufficient to support a claim under the IWCA. *Phillips v. Cont'l Tire The Americas, LLC*, 743 F.3d 475, 478 (7th Cir. 2014). Beal "must affirmatively show that the discharge was primarily in retaliation for [his] exercise of a protected right." *Id.* at 477.

Only the causation element is in dispute, which requires Beal to show "that the relevant decision-maker knew [he] intended to file or had filed a workers' compensation claim." *Hillmann*, 834 F.3d at 794. Beal again invokes the "cat's paw" theory to impute Supervisor Perry's knowledge of his workers' compensation claim to

47

General Manager Jolicoeur, *see* [87] at 21, but "Illinois courts have not recognized a cat's paw theory of liability in this context." *Hillmann*, 834 F.3d at 794. Jolicoeur did not know about Beal's workers' compensation claim when he signed off on Beal's discharge.[10] [88] ¶ 36. Jolicoeur was never notified about Beal's work restrictions or that Beal received shoulder surgery. [88] ¶ 76.

Beal asserts that even if the cat's paw theory does not apply, Supervisor Perry notified General Manager Jolicoeur of Beal's "late report" of his fall at work. [87] at 21 (citing [88] ¶ 36). If Beal is alluding to an alternative basis for liability when employees exercise their IWCA rights "merely by requesting and seeking medical attention," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012), the argument is not developed. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010) (perfunctory and undeveloped arguments are waived).

In any event, a "late report" of injury without any indication that Jolicoeur knew Beal requested medical attention or received surgery in connection with the workplace injury is insufficient to establish knowledge. In *Beatty v. Olin Corporation*, the court accepted as true that another employee had erroneously told the plaintiff that he no longer needed to call in absences, but this fact only proved the point that the decisionmaker fired plaintiff "based on incorrect or incomplete information" rather than for the exercise of his statutory rights. 693 F.3d 750, 754 (7th Cir. 2012).

---

[10] Beal disputes General Manager Jolicoeur's lack of knowledge about his workers' compensation claim, but the cited deposition testimony only refers to knowledge of a late report of injury. *See* [89-27] at 55:7–56:12. Jolicoeur expressly denied having information of a workers' compensation claim being filed in connection with Beal's fall. *Id.* at 67:5–6.

The court also rejected the plaintiff's argument that he was discharged for failing to call in missed days because he was complying with instructions from the employer's medical department to attend a medical examination. *Id.* An "obvious failure of communication" was not sufficient evidence of retaliatory motive, which requires more than "sloppy personnel practices." *Id.*

Here too, no reasonable jury could infer retaliatory motive on General Manager Jolicoeur's part if he "didn't know about [Beal's] injury or medical status when he issued the termination order." *Id.* The CTA's motion for summary judgment on the IWCA retaliatory discharge claim is granted.

### D.    Failure to Mitigate Damages

Beal moves for summary judgment on the CTA's affirmative defense for failure to mitigate damages, arguing that the CTA fails to dispute Beal's reasonable diligence in seeking comparable employment. [77] at 13–15.

Back pay under the ADA is a form of equitable relief granted by the court. *See* 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions, 42 U.S.C. § 2000e-5(g)(1)); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) ("Front pay and back pay under Title VII and the ADA are 'equitable' matters."). "When assessing back pay… the judge must respect the findings implied by the jury's verdict. But whatever discretion the facts allow with respect to back pay and front pay belongs to the judge rather than the jury." *Pals*, 220 F.3d at 501.

If a jury finds the CTA liable for disability discrimination, then Beal is entitled to a presumption of back pay based on "what [he] would have earned absent the discrimination." *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003). "Once

49

[Beal] establishes the amount of damages, the [CTA] must demonstrate, as an affirmative defense, that [Beal] failed to mitigate those damages." *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990). The CTA bears the burden to prove: (1) Beal was "not reasonably diligent in seeking other employment" and (2) "with the exercise of reasonable diligence there was a reasonable chance that [Beal] might have found comparable employment." *Id.*

The CTA objects to Beal putting the cart before the horse when liability hasn't been decided by a jury yet. [85] at 14. The CTA does not dispute that Beal applied to comparable jobs, but it disputes the sufficiency of Beal's mitigation efforts.

It's not clear from the record what Beal claims his damages for back pay are. *See Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) ("Not until the plaintiff establishes what she contends are her damages does the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant."). Because Beal has not met his initial burden as a matter of law and the CTA raises a discrepancy between Beal's testimony and his supporting documents, summary judgment on the affirmative defense is denied. The sufficiency of Beal's mitigation efforts can be explored through adversarial presentation at trial or a hearing on the scope of equitable relief.

## V.     Conclusion

The parties' cross-motions for summary judgment on the failure-to-accommodate claim are denied. Plaintiff's partial motion for summary judgment on the affirmative defense, [76], is denied. Defendant's motion for summary judgment, [70], on the remaining claims under the Americans with Disabilities Act, Family and

Medical Leave Act, and Illinois Workers' Compensation Act is granted. Plaintiff's failure-to-accommodate claim survives for trial.

ENTER:

Manish S. Shah
United States District Judge

Date: July 31, 2025