**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ERNEST F. BEAL,

      Plaintiff,

    v.

CHICAGO TRANSIT AUTHORITY,

      Defendant.

No. 23 CV 1387

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ernest Beal alleged that his employer, the Chicago Transit Authority, discriminated against him by not accommodating his disability as required by the Americans with Disabilities Act, 42 U.S.C. § 12112(a)–(b). The jury found in favor of Beal and returned a verdict of $750,000 in compensatory damages for pain and suffering. The issue of equitable remedies was reserved for the court. For the reasons discussed below, the jury's verdict is reduced to $300,000 in compensatory damages and Beal is also awarded back pay and prejudgment interest as described in this opinion.

## I.    Legal Standards

The ADA incorporates the remedies for employment discrimination provided by Title VII of the Civil Rights Act. 42 U.S.C. § 12117(a) (adopting, among other provisions, 42 U.S.C. § 2000e–5(g)(1)). Under Title VII, once a district court has found that an employer has intentionally engaged in an unlawful employment practice, it can order back pay, reinstatement, and "any other equitable relief as the court deems

appropriate." 42 U.S.C. § 2000e–5(g)(1). Because back pay is an equitable remedy, any award of back pay is to be decided by the court. *See David v. Caterpillar, Inc.,* 324 F.3d 851, 865 (7th Cir. 2003). "The district court has broad equitable discretion to fashion back pay awards to make the [discrimination] victim whole." *Id.*

## II.    Facts

Plaintiff Ernest Beal began working for defendant Chicago Transit Authority in March 2004. [160] at 315:24–316:1.[1] In 2021, he was a control inspector at the Des Plaines shop. [160] at 316:16–20. On January 15, 2021, Beal fell into "the pit," a mechanical area under a train car. [160] at 329:21–330:17. A few minutes later, he reported the fall to his supervisor. [160] at 331:2–10.

Beal sought medical treatment for injuries he sustained from the fall. [160] at 354:10–20. Following an MRI, Beal was referred to a shoulder specialist. [160] at 355:2–12. The doctor gave Beal a note restricting the kind of work he could perform, which he in turn presented to his senior manager on October 8, 2021. [160] at 356:22–357:6. The senior manager told Beal that he could not work with the restrictions and that he needed to go home. [161] at 406:23–407:25. Beal believed he was on protected leave while he awaited a decision on his worker's compensation claim. [161] at 471:10–21. In February 2022, plaintiff tried to log in to his employee account to view his paystubs and discovered that he had been terminated. [161] at 451:21–453:4.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to trial transcripts, which use the transcript's original page number.

2

On December 23, 2021, Beal had surgery to repair his shoulder injury. [161] at 409:12–18. After the surgery, he was completely restricted from work. [161] at 450:17–20. His surgeon cleared him to return to work on May 11, 2022. [161] at 410:22–411:9. Beal was reinstated with the CTA on April 23, 2023. [161] at 434:9–16.

After he learned of his termination in February 2022, Beal started to look for work. [167] at 839:22–840:2. According to Beal, from February 2022 until he was reinstated in April 2023, he spent six or seven hours a day looking for a job . [167] at 841:4–10. He applied for at least four jobs during that time: "Electrician Mechanical" with Metra in July 2022 and September 2022, "1st Shift Industrial Maintenance Mechanic" with Ferrara in September 2022, "HVAC Maintenance Mechanic" with Ferrara in January 2023, and "Industrial Equipment Mechanic" with Edward Hines, Jr. VA Hospital. [171-2]. Beal did not receive any job offers before he was reinstated with the CTA. [167] at 842:3–5.

The CTA's director of compensation and benefits, Michael Bowen, testified at the remedies phase of the trial. He created a chart to help explain Beal's wage and benefit contributions during the relevant time period. The chart was used as a demonstrative exhibit but it was not offered into evidence.

III.  **Analysis**

  A.  **Statutory Cap**

The ADA sets a statutory cap of $300,000 for compensatory damages in a failure-to-accommodate case. 42 U.S.C. § 1981a(b)(3)(D). At the beginning of the equitable relief hearing, the parties confirmed that the statutory cap would apply and

3

the jury verdict would necessarily be reduced to $300,000. [167] at 823:12–19, 894:13–16. Yet plaintiff's brief on equitable remedies includes a footnote asserting that the CTA has waived any claim to apply the statutory cap by not pleading it as an affirmative defense. [171] at 7 n.2. Beal's reply brief further argues that it would be premature to apply the statutory cap before entering judgment on the jury's verdict. [176] at 1–2.[2]

The Court of Appeals for the Seventh Circuit has not explicitly answered the question of whether a statutory cap may be waived. *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003). Other courts have found that a defendant's failure to raise a statutory limitation on liability waives the defense. *See, e.g.*, *Carrasquillo-Serrano v. Mun. of Canovanas*, 991 F.3d 32, 42–43 (1st Cir. 2021); *Racher v. Westlake Nursing Home Ltd.*, 871 F.3d 1152, 1163 (10th Cir. 2017). But the failure to plead an affirmative defense works a forfeiture only if the plaintiff is harmed by defendant's delay in asserting it. *Carter*, 333 F.3d at 796.

Here, Beal conceded to the statutory cap before trial. In the parties' proposed pretrial order, Beal sought $300,000 in compensatory damages, citing a case that applied a statutory cap. [131] at 30–31. Beal had no expectation that he would be awarded more than $300,000 in compensatory damages.

---

[2] Defendant has not formally moved the court to apply the cap, but the issue is ripe for determination now. I have already addressed the statutory cap with the parties and am prepared to enter a final judgment in the case.

Further, even if the statutory cap operates as an affirmative defense and can be waived, Beal's verbal confirmation that the statutory cap would apply resulted in a waiver of waiver. This confirmation was not an "informal colloquy" as plaintiff asserts; my questions—and plaintiff's answers—were unambiguous and served a clear purpose. As I stated at the hearing on equitable relief, "the judgment with respect to compensatory damages will be capped at [$300,000]." [167] at 894:15–16.

## B.    Failure to Mitigate

Defendant argues that Beal should be barred from recovering back pay because he failed to mitigate his damages. "[A] discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989). Although the duty to mitigate falls on plaintiff, it is defendant's burden to establish that Beal failed to mitigate his damages. *See Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F. 3d 1037, 1044 (7th Cir. 1994). The CTA must show (1) that Beal failed to exercise reasonable diligence to mitigate his damages; and (2) that there was a reasonable likelihood that Beal might have found comparable work by exercising reasonable diligence. *See id.*; *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990) (emphasizing that an employer must prove both elements in order to succeed on a failure-to-mitigate defense).

The CTA argues that plaintiff's claimed job-search efforts are unsupported. [172] at 4. Beal's 151-page exhibit purporting to show his job search, ultimately confirms that Beal applied to just four jobs over the course of his unemployment. [171-2]. That said, defendant did not produce any evidence contradicting plaintiff's

testimony that he was actively seeking employment. The exhibit shows that he subscribed to Indeed, uploaded an updated resume and cover letter, and applied to some jobs that he believed were within his wheelhouse. Beal's efforts are corroborated by the fact that his applications resulted in a couple of interviews. [167] at 841:20–24. Though he did not ultimately receive a job offer, Beal put forth evidence to show he was seeking employment and defendant has not produced evidence suggesting that plaintiff was not diligent in his efforts.

But even if I agreed with the CTA's argument that plaintiff's "minimal" efforts were insufficient, defendant has similarly failed to meet its burden with respect to the second element. Defendant presented no evidence suggesting that there was a reasonable likelihood that Beal would have found comparable work had he exercised reasonable diligence. Instead, the CTA argues that the same evidence Beal used "to support prong one necessarily supports CTA on prong two" because there were several openings that he "could have pursued with reasonable diligence." [172] at 6.

But this argument misstates the standard. While there were clearly available job openings, defendant has done nothing to establish that these jobs were comparable to that which Beal held while employed by the CTA. *See Gurnee Inn*, 914 F.2d at 818. Specifically, the CTA has not put forth evidence showing that these jobs had similar pay, benefits, or promotional opportunities, nor (more importantly) that Beal would have been offered one of the positions had he applied. Indeed, Beal testified that he did not receive an offer from the companies he interviewed with, tending to show that comparable work was not available. [167] at 841:25–842:2.

The CTA has failed to carry its burden. Beal's back-pay award will not be reduced for failure to mitigate.

### C.    Back-Pay Calculation

Once a jury finds that employment discrimination has occurred, there is a presumption that the employee is entitled to an award of back pay. *See David,* 324 F.3d at 865; *Gurnee Inn,* 914 F.2d at 817–18. While the claimant must establish the amount of damages, he is presumptively entitled to full relief. *Hutchinson*, 42 F.3d at 1037. The burden then shifts to the defendant to show that the plaintiff failed to mitigate his damages or that the damages were less than he asserts. *Id.* at 1044. As discussed above, the CTA has failed to show that Beal failed to mitigate his damages. I turn now to defendant's argument that Beal's damages were less than he asserts.

### 1.    *Applicable Time Period*

The parties first disagree over the applicable time period. Though defendant agrees that Beal is entitled to back pay for the time between his final day of work and his surgery (which rendered him completely unable to work),[3] the CTA does not agree that Beal is entitled to compensation from the day he was medically released to return to work to the day his employment was reinstated. [172] at 7.

---

[3] I note, however, that it is unclear what accommodation was available that would have allowed Beal to work with restrictions during this first period before his shoulder surgery. It is plaintiff's burden to show that an accommodation would have been available. At trial, plaintiff testified that he observed two other employees do light-duty work. [161] at 412:19–413:21; [161] at 415:5–20. But that was not sufficient to establish an actual available accommodation. The CTA does not now dispute the availability of back pay between Beal's October 8, 2021 meeting with his general manager and his shoulder surgery on December 23, 2021, so I calculate an award for that period.

Plaintiff was unable to prove his retaliatory discharge claim, but that does not mean that Beal failed to prove the consequences of the CTA's failure to accommodate his disability. The fact that plaintiff could not pursue one legal theory (retaliatory discharge) does not bar equitable relief related to a second, successful legal theory (failure to accommodate). The evidence at trial confirmed that Beal would not have been terminated but for his failure to show up for work, and Beal stopped showing up for work when the CTA failed to accommodate him. Beal consistently testified that he wanted to work. *See, e.g.*, [161] at 424:21–425:1. I find that if he could have been working, he would have been working.

The CTA next argues that plaintiff has not established that he would have been permitted to return to full-duty work from the date he was cleared by his doctor. [172] at 3. Michael Bowen, the CTA's director of compensation and benefits, testified to the steps an employee would need to take to return to work after being out for more than ninety days. [167] at 879:8–16. Beal does not (and cannot) argue that he would have been out of work for fewer than ninety days even if the CTA had not failed to accommodate him: his surgery was in December and he was not cleared to return to work until May. Therefore, according to defendant, the burden was on Beal to show that he would have met all the conditions precedent and been allowed to return to work "full duty and full-time." [172] at 3.

I agree with the CTA that the doctor's note releasing Beal's medical conditions does not establish that he would have automatically qualified to return full-time. [172] at 3. But where the CTA had already terminated plaintiff months before the

8

doctor's note was issued, I do not agree with defendant that Beal needed to establish the other return-to-work requirements to support equitable back pay. In May 2022, Beal was unemployed. He did not have the opportunity to go through the CTA's third-party medical provider or go through any training the CTA may have required in order to get back to work. Those avenues were not open to Beal because the CTA had fired him. Had the CTA not failed to accommodate his disability, and given that Beal credibly testified that he wanted to return and ultimately was capable of doing his job, I conclude that that it is more likely than not that Beal would have successfully returned around May 2022. Back pay from the date Beal was cleared to return to work after his surgery until the day of his reinstatement would make Beal whole for the failure to accommodate. *See* [162] at 524:3–9 (testimony about when plaintiff could return to full duty).

### 2. Scope of Relief

An award of back pay generally includes lost wages, bonuses, benefits, and other forms of compensation that a plaintiff would have earned absent discrimination rendering them unable to work. *See Kossman v. Calumet Cnty.*, 849 F.2d 1027, 1032 (7th Cir. 1988). Plaintiff argues that he is entitled to damages for lost regular and overtime wages, health and dental benefits, and union contractual pay. [171] at 4–6. I address each in turn.

### a. Lost Wages

Defendant presented evidence of Beal's lost wages for the period of October 8, 2021 to December 23, 2021: $29,629.95. [167] at 877:17–25. Plaintiff agrees with the

9

calculation. [171] at 4. But the parties disagree over whether this number should be offset by what plaintiff would have contributed for his share of health and dental insurance and retirement benefits.

Though Beal argues that he had to find replacement health insurance during this time, [171] at 4, he does not provide receipts showing the source or amount of such payments. [167] at 848:15–24.

Even if he had, the purpose of equitable relief is to make plaintiff whole; it is not to provide him with a windfall. *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 234 (1982) (noting that backpay should not "catapult [plaintiffs] into a better position than they would have enjoyed in the absence of discrimination"). It is undisputed that if Beal were working during this time, then he would have been contributing to his share of insurance premiums. Declining to deduct the contributions that Beal would have paid would unfairly overcompensate him.

By that same logic, Beal's recovery should be supplemented by what the CTA would have contributed to his pension. Beal testified, and the CTA's director of compensation and benefits agreed, that the CTA contributed 26.64% of an employee's gross earnings to his pension. [167] at 879:25–880:9. Like the contributions plaintiff would have made to his medical benefits had he been working during this time period, the CTA similarly would have been making contributions to his retirement benefits. As explained above, a victim of employment discrimination is presumptively entitled to full relief. *Hutchinson*, 42 F.3d at 1037.

Beal is entitled to the wages for the pre-surgery time period, reduced by the employee-side contributions for his medical and dental benefits and increased by the CTA's contributions to his retirement plan.

With respect to the time period between when Beal was able to return to work and his eventual reinstatement, the CTA does not challenge plaintiff's calculation. I find that plaintiff's lost-wage calculation for the time period of May 11, 2022, to April 24, 2023, is supported by the record. *See* [171-3]. Beal's earnings during this time would have been $81,404.

Like Beal's pre-surgery earnings, his post-surgery earnings should be offset by his contributions to his medical and dental benefits and supplemented by the CTA's contributions to his retirement plan.

b.      Lost Overtime Pay

Beal next alleges that he is entitled to lost overtime pay for the second time period, when he would have been back to full capacity and able to work a comparable amount of overtime as he had before his injury. Plaintiff's overtime calculation is based on the number of overtime hours he worked in 2025. [171] at 5 (citing [167] at 836:15–19.

No CTA employee is entitled to overtime. Further, equitable relief must be grounded in available facts and not speculative. *Downes v. Volkswagen of Am.*, 41 F.3d 1132, 1142 (7th Cir. 1994). Beal has not explained why his 2025 overtime pay— years after recovering from surgery and years after the COVID-19 pandemic—is an appropriate comparison. Even if Beal could prove that he would have worked a

certain amount of overtime, he ultimately did not work these hours. Compensating him for overtime hours that he did not complete would go beyond making him whole and would instead operate as a windfall. I decline to award plaintiff the lost overtime wages he seeks. [171] at 5.

### c.     Lost Union Contract Pay

Finally, Beal argues that he is entitled to back pay from a one-time payment he missed following his termination. [171] at 6. As part of a collective bargaining agreement entered into by his union, all employees on the payroll as of February 18, 2022, received a check for 5% of the money they made in 2020. [167] at 887:18–25. Bowen testified that Beal would have been eligible. [167] at 888:14–21. Unlike the overtime hours that he did not actually work, the lost union contract pay relates to hours that Beal did in fact work. He is entitled to recoup the money that he would have received but for the CTA's failure to accommodate his disability.

I find, however, that the 5% payment is sufficient to make plaintiff whole and need not be supplemented by retirement contributions on that payment. Bowen testified that the CTA would contribute 26.64% of an employee's gross earnings to his retirement plan. [167] at 879:25–880:9. There is no evidence to support a finding that the CTA would have similarly contributed 26.64% of Beal's lost union contract pay (which was not part of his gross earnings for the 2020 calendar year) to his retirement plan. Adopting Beal's calculation, he is entitled to $3,942 in lost union contract pay. *See* [171] at 6 (citing [171-4] at 3).

12

### D. Prejudgment Interest

Prejudgment interest is "presumptively available to victims of federal law violations." *Bolden v. Pesavento*, 158 F.4th 879, 882 (7th Cir. 2025) (citations omitted). It is measured "from the time the claim accrues until judgment is entered." *Id.* at 882–83 (citations omitted). But prejudgment interest is compensatory, not punitive, and it is not meant to penalize the party who caused the injury. *Id.* at 882.

Both parties agree that Beal is entitled to prejudgment interest on his back-pay award. The CTA, however, argues that plaintiff cannot recoup prejudgment interest on his compensatory-damages award because the jury's verdict did not distinguish between past and future damages. [172] at 9. While prejudgment interest "is not assessed on future damages arising after the claim has already accrued," it is nevertheless appropriate for noneconomic damages based on past pain and suffering. *Bolden*, 158 F.4th at 883; *see also id.* ("There is nothing special about noneconomic damages exempting them from the principle that money today is worth more to the plaintiff than money tomorrow.").

The jury returned a general verdict of total compensatory damages. [155]. Disaggregating past from future damages in the jury's verdict would be difficult. *Bolden*, 158 F.4th at 886. But "the district court should do its best to ascertain the portion of the verdict attributable to past damages unless doing so would be impossible or hopelessly speculative." *Id.* at 887 (internal quotation marks omitted).

Like in *Bolden*, the emphasis at trial was clearly on the emotional harm Beal endured from the loss of his job rather than on his post-reinstatement damages. *Id.*

13

In his closing argument, plaintiff explicitly asked the jury for emotional distress damages from October 8, 2021, until his reinstatement in April 2023. [165] at 783:1–7. The jury instructions similarly described the form of available relief in the past tense. [165] at 753:19–754:3. I therefore find that Beal is entitled to prejudgment interest on both his compensatory damages and back-pay award.

The parties agree on the applicable prime rate for calculating prejudgment interest: 6.75%. They also agree on the applicable interest period: between when Beal stopped working on October 8, 2021, and the date of judgment.

The CTA argues that the rate should be compounded monthly. [172] at 9 (citing *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002)). Plaintiff cites the same case for the proposition that prejudgment interest should be compounded following each time a plaintiff would have been paid. [176] at 5. In the case of Beal, this was biweekly. *See, e.g.*, [173-3]. I agree with plaintiff's interpretation, which is supported by other courts in this district. *Rabiu v. Abbott Lab'ys*, 819 F.Supp.3d 864, 878 (N.D. Ill. 2026) (collecting cases that follow this approach). While there is no shortage of cases that compound monthly, those cases do not state a plaintiff's pay frequency nor cite circuit precedent suggesting that compounding monthly is an absolute rule.[4] I conclude that Beal is entitled to 6.75% prejudgment interest on his back-pay award, compounded biweekly.

---

[4] *See, e.g.*, *Cabernoch v. Union Labor Life Ins.*, 2009 WL 2497669, at *4 (N.D. Ill. Aug. 14, 2009) (compounding monthly while noting that "there appears to be little guidance from the Seventh Circuit on the matter); *Alcazar-Anselmo v. City of Chicago*, 2011 WL 3236024, at *5 (N.D. Ill. July 27, 2011) (compounding monthly to "not deviate from the norm" but citing no precedent ratifying such norm); *Wescher v. Chem-Tech. Int'l*, 2016 WL 7441655, at *5 (N.D. Ill. Dec. 27, 2016) (same).

14

For his past pain and suffering, Beal is entitled to 6.75% simple interest on his compensatory damages, as the award operates as a lump-sum payment and thus should not be compounded by Beal's payment frequency.

### E.    Injunctive Relief

Finally, Beal's request for injunctive relief is denied. Plaintiff seeks to have the CTA train its managers, supervisors, and rank-and-file workers on the CTA Administrative Procedures that were at the center of this case. [171] at 11. While a district court may order employers to engage in prospective action that it deems appropriate, *see* 42 U.S.C. § 2000e-5(g)(1), injunctive relief must be tailored to the conduct and supported by the evidence in the case. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 661–62 (7th Cir. 2022).

The CTA employs nearly 11,000 employees. [172] at 10. Plaintiff's request that the CTA train *all* its employees—managerial and non-managerial employees alike—is overbroad and not tailored to the evidence presented in this case. At most, Beal established that one senior manager was unfamiliar with certain internal procedures (and that employees in Beal's department did not receive formal training on the procedures). *See, e.g.*, 160 at 283:12–14. But Beal has not shown that the far-reaching relief he seeks is likely to prevent the discrimination he faced from happening again. *See Wal-Mart*, 38 F.4th at 662. This incident involved a unique injury and a limited number of employees; the requested training is not warranted.

## IV. Conclusion

Beal is entitled to $300,000 in compensatory damages for pain and suffering, simple prejudgment interest on his compensatory damages, back pay (reduced by insurance premiums Beal would have paid and increased by retirement contributions he would have received), and prejudgment interest on his back-pay award compounded biweekly. The parties shall submit proposed calculations consistent with this order by August 19, 2026, calculating prejudgment interest up to the date of the parties' submission.

ENTER:

Manish S. Shah
United States District Judge

Date: July 29, 2026

16